**UNITED STATES of America,
Plaintiff,**

v.

**ALISAL WATER CORPORATION,
et al., Defendants.**

**No. C–97–20099–JF(EAI).**

United States District Court,
N.D. California.
San Jose Division.

May 20, 2004.

Lori Jonas, Matthew Fogelson, Environmental Enforcement Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, for Plaintiff.

Marc P. Fairman, Law Offices of Marc P. Fairman, San Francisco, CA, for Adcock Defendants.

S. Gary Varga, Monterey, CA, for Trust Defendants.

ORDER IMPOSING CIVIL PENALTY; GRANTING MOTION TO STRIKE EXPERT'S REPORT AND OTHER WISE DENYING MOTION TO STRIKE EXTRINSIC EVIDENCE; AND DENYING MOTION TO STAY PENDING APPEAL

FOGEL, District Judge.

## I. PROCEDURAL HISTORY

On August 23, 2000, the Court granted partial summary judgment with respect to counts 1–9 of the complaint, establishing the liability of the Individual and Corporate Defendants for hundreds of violations of the Safe Drinking Water Act ("SDWA"). On November 8, 2001, the Court granted partial summary judgment with respect to counts 11–13 of the complaint, establishing additional violations of the SDWA. The Court conducted a trial between December 4, 2001 and January 8, 2002 for the purpose of determining an appropriate remedy for the adjudicated violations.

On February 7, 2002, the Court issued a memorandum of intended decision concluding that an appropriate remedy would include divesting Defendants of all of their water systems except Alco and imposing "a very substantial civil penalty." The Court noted that this approach would be costly because it would require the appointment of a receiver to manage the smaller systems, to investigate the feasibility of selling Defendants' small water systems separately from their largest system, Alco, and to monitor Defendants' compliance with applicable laws and regulations with respect to Alco. The Court also noted that this approach would require a further trial on the government's fraudulent conveyance claim and would extend for an indefinite time the uncertainty regarding the ultimate resolution of the instant litigation. The Court suggested an alternative remedy that would include divestiture of all of Defendants' water systems, imposition of a civil penalty in the amount of $75,000 and dismissal of the government's fraudulent conveyance claim. The Court noted that, although the proposed penalty of $75,000 was far less than that sought by the government and substantially less than the Court was inclined to assess under the first approach, the alternative approach would be cost effective, would achieve finality and would further the government's primary goal of protecting public health. The Court gave the parties fifteen days to consider its suggested alternative remedy. Defendants rejected the alternative remedy, and the Court subsequently appointed a receiver with the duties described in the memorandum of intended decision.

On July 17, 2002, the Court commenced trial on the fraudulent conveyance claim. On May 2, 2003, the Court issued its findings of fact and conclusions of law, finding that the Individual Defendants had acted with actual intent to defraud the government by transferring substantial assets into various trusts in order to frustrate the government's ability to collect a potential civil penalty in this case. The Court therefore concluded that the trust assets properly could be considered in assessing Defendants' ability to pay a civil penalty.

At the suggestion of Defendants' counsel[1] and with the consent of the parties, the Court thereafter appointed Richard Pierotti and the accounting firm of Kokjer, Pierotti, Maiocco & Duck, LLP to determine the liquidation value of the assets owned by Defendants. The purpose of this appointment was to evaluate Defendants' ability to pay a civil penalty. Mr. Pierotti submitted his analysis on November 5, 2003. Defendants objected to Mr. Pierotti's analysis both orally at a hearing on January 21, 2004 and in written briefs. After considering Defendants' objections, and bearing in mind that the purpose of Mr. Pierotti's analysis was not to fix the precise market value of any asset but to provide the Court with a professional assessment of Defendants' overall financial condition, the Court concluded that the analysis is reasonable and not clearly erroneous.

The Court requested a final round of briefing on the issue of an appropriate civil penalty and heard approximately two hours of oral argument on May 7, 2004. Having considered the briefs submitted prior to that hearing,[2] the arguments pre-

---

1. The Individual and Corporate Defendants since have substituted new counsel.

2. On Wednesday, May 5, counsel for the Individual and Corporate Defendants submitted a letter to the Court asserting that the govern-

ment had filed its reply brief on the penalty issue six days late. Counsel requested that the Court strike the reply brief or, in the alternative, allow him to present a short response at hearing. When questioned, counsel for the government explained that she had

sented by counsel and the record as a whole, the Court makes the following determinations:

## II.  DISCUSSION

### A.  Civil Penalty

#### 1.  Factors To Be Considered

Civil penalties under the Safe Drinking Water Act ("SDWA") are governed by 42 U.S.C. § 300g–3(b), which provides that the Court may assess a civil penalty not to exceed $25,000 per day per violation.[3] The section states that the Court should take "into account the seriousness of the violation, the population at risk, and other appropriate factors."

If the Court treats each of the 232 violations of the SDWA at issue as a single-day violation, the maximum statutory penalty would be approximately $17 million.  If the violations are treated as multi-day violations, the maximum statutory penalty would be in excess of $400,000,000.  No court has imposed a civil penalty that even approaches sums of this magnitude.  To the contrary, the few reported cases involving similar SDWA violations have resulted in civil penalties in thousands rather than millions of dollars.  *See, e.g., United States v. City of North Adams*, 1992 WL 391318 (D.Mass.1992) ($67,200);  *United States v. Alder Creek Water Co.*, 823 F.2d 343 (9th Cir.1987) ($6,200).

The government asserts that the Court should look to another environmental statute, the Clean Water Act ("CWA"), for additional guidance in assessing a civil penalty.  Under the CWA, courts consider the seriousness of the violation, the economic benefit (if any) resulting from the violation, any history of violations, any good-faith efforts to comply with applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.  33 U.S.C. § 1319(d).  The government cites a number of CWA cases imposing penalties in millions of dollars.  *See, e.g., United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir.1996) ($ 3 million);  *United States v. Allegheny Ludlum Corp.*, 187 F.Supp.2d 426 (W.D.Pa.2002) ($8.2 million);  *United States v. Smithfield Foods, Inc.*, 972 F.Supp. 338 (E.D.Va.1997) ($ 12.6 million).

Defendants argue that the cases cited by the government are distinguishable in that they involve actual discharge of contaminants by large and wealthy corporations, while the instant case involves failure to report by a small family-owned operation.  The Court concludes that the factors set forth under the CWA may be useful in determining a civil penalty here, but that a penalty of the magnitude imposed in the CWA cases is inappropriate because of the distinctions noted by Defendants.

This Court made express findings as to the seriousness of the violations and Defendants' history of non-compliance in its memorandum of intended decision issued February 7, 2002.  It concluded that the violations were serious and not of a technical nature, stating as follows:

expected the Court to issue a written ruling on her motion to strike evidence prior to the date the government's reply brief was due, and that she waited for that ruling before filing her reply brief.  She stated that she submitted her reply brief immediately once she realized that the Court would not issue a written ruling on the motion to strike evidence.  Counsel's explanation is reasonable, and the Court concludes that Defendants were not prejudiced by the late-filed reply brief.  The Court stated at the hearing that the late-filed reply brief would be considered, and as requested it permitted Defendants' counsel to address the contents of the late-filed reply brief in oral argument.

**3.**  This amount was increased to $27,500 for violations occurring after January 30, 1997.

Defendants not only failed repeatedly to self-monitor as required by law but also failed repeatedly to make required reports to regulatory agencies and to their consumers. They submitted false test results, at best with gross negligence and at worst with conscious intent to deceive. Finally, by failing or refusing to cooperate with regulators, they unreasonably delayed in identifying and removing sources of contamination, forcing many consumers to rely upon boiled or bottled water for extended periods of time.

Feb. 7 Mem., 4–5. There was evidence at trial that the water in Defendants' smaller systems burned skin, caused gastrointestinal problems or had an unusual color or odor. *Id.* at 5. Moreover, there was evidence that "repeated exceedances of the MCL create a serious risk of harm, even in the absence of evidence showing how many users actually became ill." *Id.*

The Court found that the violations spanned approximately a decade, from the early 1990s to mid–2001, and that "Defendants' conduct reflects a persistent pattern of non-compliance with the most basic responsibilities of a public utility." *Id.* at 6. State and county regulatory personnel testified at trial that they made extensive efforts to resolve matters informally with

Defendants, but that it was extremely difficult to obtain even the most basic cooperation from them. *Id.* Defendants responded at every turn with objections and litigation. *Id.*

Approximately 28,000 customers were served by Defendants' water systems during the period in question.[4] Defendants concede that the violations were serious, but argue that many other small systems have had compliance issues and that in other cases larger numbers of people were affected.[5] Defendants' point seems to be that, by comparison, their conduct was not so bad. Defendants even assert explicitly that "the violations in this case are far less serious than if hundreds of thousands of people had been affected." Defendants' Opening Memorandum, 7. This argument highlights what the Court has characterized as "[p]erhaps the most vexing aspect of this case," that is, Defendants' repeated attempts to minimize the significance of their own misconduct and/or to cast blame elsewhere. *See* Feb. 7 Memorandum, 6.

Defendants assert that their conduct is mitigated by good faith efforts to comply with applicable requirements. However, the record reflects that for the most part the efforts referenced by Defendants were in response to the Court's orders, which

---

4. Both the government and Defendants have used the 28,000 figure during the course of this litigation, although the government's opening brief on the issue of penalty uses a 25,000 figure. This discrepancy is immaterial to the Court's analysis, as it is clear that a significant number of people were affected by Defendants' conduct.

5. Defendants request judicial notice of articles and publications downloaded from the websites of the EPA, the California DHS and newspapers. The United States objects to the request for judicial notice and moves to strike these documents. Where, as here, the documents are introduced for the purpose of demonstrating facts not reasonably subject to dis-

pute—that other small systems have had compliance problems and other cases have involved larger numbers of consumers—judicial notice is appropriate. *See Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 458–59 (judicial notice appropriate with respect to newspaper articles about widespread layoffs); *Interstate Natural Gas Co. v. Southern California Gas Co.,* 209 F.2d 380, 385 (9th Cir.1953) (judicial notice appropriate with respect to administrative records and reports). The Court notes that the documents in question have limited relevance to the instant inquiry and are considered solely as part of the totality of the circumstances under which Defendants' violations occurred.

required specific improvements to be made and required more generally that Defendants come into compliance with applicable laws and regulations.

The final factor to be considered by the Court is the economic impact of the penalty on Defendants. The liquidation analysis of the independent accountant, Mr. Pierotti, concludes that in the event all of Defendants' assets were liquidated, Defendants would have $2,025,739 with which to pay a penalty. That analysis takes into account assets held in trust ($1,070,279); personal assets held outside of trust ($79,327); equity ownership in Alisal Water Corporation ($564,149); and Defendants' equity in Toro Water Service ($311,984).[6]

Defendants dispute Mr. Pierotti's analysis, and submit the analysis of their own accountant, Dr. Joel Berk. Mr. Pierotti found that Defendants have equity of $564,149 in Alisal Water Corporation based upon his opinion that the Corporation's Salinas Division has a gross valuation of approximately $7.8 million. Dr. Berk asserts that the proper valuation of the Salinas Division is only $4.8 million and concludes on the basis of that assertion that Defendants actually have no equity in the Corporation.

The government moves to strike Dr. Berk's evidence as untimely, cumulative and non-compliant with Fed.R.Civ.P. 26. The government also argues that if the Court considers Dr. Berk's evidence, the government must be given an opportunity to obtain a proper Rule 26 expert report, depose Dr. Berk and prepare a rebuttal report.

■ The Court concludes that Dr. Berk's analysis inappropriately revisits the methodology and conclusions of Don Howard Engineers ("DHE"), upon whose underlying appraisal Mr. Pierotti's valuation largely is based. Defendants' objections to the DHE appraisal were litigated at trial. Defendants' trial expert, Carl Danner, sharply criticized the opinions of the government's trial expert, Robert Harris, and the DHE appraisal upon which Mr. Harris relied. Defendants' objections to Mr. Pierotti's analysis were briefed and argued to the Court; after consideration of those objections, the Court ruled that Mr. Pierotti's analysis is "reasonable and not clearly erroneous." While the Court gave Defendants leave to address the validity of Mr. Pierotti's analysis in their penalty briefs, it did not envision repetition of arguments already made and rejected, particularly as to issues that Defendants had a full and fair opportunity to litigate at trial.[7] Rather, the Court was interested in any changes in circumstances that might affect Mr. Pierotti's analysis, such as post-trial fluctuations in the value of assets or other post-trial economic factors affecting the value of Defendants' water systems. Viewed as a whole, Dr. Berk's opinions concern facts known to and litigated by the parties at trial. Accordingly, the Court

---

6. In its opening brief on penalty, the government notes that Mr. Pierotti assumed the Moss Landing system would be sold for $123,000 and the NORMCO system would be sold for $42,000. Although the highest bids ultimately received for these systems actually exceeded these estimates, the Court subsequently ordered that it was in the public interest for the systems to be sold to Pajaro/Sunny Mesa Community Services District for

$15,000 and $18,000 respectively (see discussion at pp. 1038–39, *infra*). Mr. Pierotti's liquidation analysis therefore should be adjusted by $132,000, resulting in a total liquidation value of $1,893,739.

7. Notably, in support of their position at trial that they were not insolvent, Defendants' expert, Mr. Danner, criticized Mr. Harris's valuation of Alco (which in turn was based on Mr. Howard's methodology) as being *too low*.

will grant the government's motion to strike Dr. Berk's report.[8]

## 2. The Appropriate Penalty In This Case

Apparently viewing the issue of penalty through the same filter that has prevented them from recognizing the seriousness of their conduct throughout this litigation, Defendants argue that "Robert and Patricia Adcock have been punished enough," and that the Court either should decline to impose any further penalty or should impose a penalty of $100,000 or less. The government, on the other hand, argues that Defendants should be treated more severely than many convicted *criminal* defendants, suggesting a complicated plan under which the Individual Defendants would be forced to take a reverse mortgage and would be stripped of all assets except those sufficient to generate an annual income of $24,071 for the remainder of their life expectancy. In order to ensure that Defendants receive no more than this amount in the event liquidation of the water systems were to result in more income than presently is anticipated, the government asks that the Court impose a penalty of $3 million. The parties' suggestions represent the extremes within the spectrum of possible penalties. Not surprisingly, the Court concludes that an appropriate penalty lies somewhere between the two.

■ After careful consideration of the entire record and the relevant law, the Court concludes that a gross penalty of approximately $500,000 is appropriate.

This penalty is significantly higher than the penalties imposed in the few reported SDWA cases. However, the Court believes such a penalty is warranted in light of the number and nature of violations at issue, Defendants' repeated refusals to cooperate with regulators over a span of years, the serious risks to public health and the fears and inconvenience imposed upon thousands of Defendants' customers. The Court notes that in at least one of the SDWA cases, *City of North Adams,* 1992. WL 391318 (D.Mass.1992), the court reduced the penalty based in part upon the fact that additional expenditures by the municipality ultimately would be passed on to the residents. No such consideration is present here.

A $500,000 penalty is significantly lower than those imposed in the CWA cases relied upon by the government. As is discussed above, the Court concludes that these cases are not directly analogous because they generally involve actual discharge of contaminants by large and wealthy corporations. However, setting such distinctions aside, the CWA cases do reflect the strong public interest in enforcing environmental laws and regulations.

In its Order of April 13, 2004, the Court directed the receiver to accept particular bids for purchase of the small water systems. The Court acknowledged that the bids for the Moss Landing, NORMCO and Vierra Canyon systems were not the highest received, but concluded that the public interest nonetheless would be served best by sale of these systems to the Pajaro/Sun-

8. The Court notes that Defendants use Dr. Berk's analysis to mount a separate challenge to Mr. Pierotti's valuation of the trust assets. Some of the real property held in trust is collateral for loans to Alisal Water Corporation. Mr. Pierotti accounted for this fact in his analysis. Defendants argue that if Dr. Berk is correct, liquidation of the Salinas Division would not result in sufficient funds to cover the loans secured by the trust property and that property would be sold to satisfy the loan debt. In light of the Court's conclusion that Dr. Berk's report must be stricken, Mr. Pierotti's valuation of the trust assets no longer is at issue.

ny Mesa Community Services District. The difference between the highest bids received for these systems and the bids selected by the Court is approximately $300,000. The Court has stated on a number of occasions that in order to avoid an improper taking of Defendants' property the difference between the highest bids for these assets and the bids actually selected by the Court would be treated as an offset against any civil penalty imposed. Having concluded that a gross penalty of approximately $500,000 is appropriate, and in light of the fact that Defendants already have been made subject to a de facto penalty of approximately $300,000, the Court will require Defendants to pay an actual cash penalty of $200,000 for their numerous violations of the SDWA.

### B. Stay Of Order Re Sale Of Receivership Assets

Defendants move to stay the Court's order regarding sale of the receivership assets ("Sale Order"). In certain places in their briefs Defendants request a stay pending appeal, but in other places they request a stay only until ten days after entry of final judgment in this action. The latter request makes little practical sense, because Defendants would then have to return to this Court to request a stay of the Sale Order pending appeal. *See* Fed. R.App. P. 8(a) (providing that a party must seek a stay pending appeal in the district court before seeking such stay in the appellate court). The government treats Defendants' motion as a request for stay pending appeal. Because entry of final judgment is imminent and Defendants would have to return to this Court to seek a stay pending appeal in any event, the Court likewise will treat Defendants' motion as a request for stay pending appeal.

Pursuant to Fed.R.Civ.P. 62(a), there is no automatic stay pending appeal

in receivership actions; orders and judgments in such action are stayed only upon order of the court. In order to obtain a stay pending appeal, a party must meet the standard governing preliminary injunctions. That is, the party must demonstrate a "probability of success on the merits and the possibility of irreparable injury" or "that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir.1983). Defendants do not argue that they are likely to succeed on the merits. They appear to be arguing that serious legal questions are raised because many of the Court's rulings were matters of first impression. However, they present no argument that the Court's reasoning on these matters was incorrect. The government points to these deficiencies in its opposition. In reply, Defendants state that they did not specifically argue probability of success on the merits because that issue has been thoroughly briefed in other motions and they did not believe the Court needed further argument on that issue. To the extent that Defendants reasonably have relied on their previous arguments on the merits, the Court finds such arguments no more persuasive now than it has in the past.

Defendants do address irreparable injury and the balance of hardships. Obviously, sale of the receivership assets will cause some degree of irreparable injury, because it will be impossible to unring the bell in the event Defendants prevail on any appeal. However, irreparable injury alone is not a sufficient basis for granting a stay, and the remaining equities do not favor Defendants' position. As is discussed above, Defendants have failed to make a convincing showing on the first prong of the test for obtaining a stay. Moreover, Defendants have sat on their rights. Although Defendants timely appealed the

Court's Order of April 9, 2002 appointing a receiver ("Receivership Order"), they did not move to expedite that appeal and in fact suspended it. The merits of the appeal have never been briefed. Had Defendants prosecuted the appeal, they might well have a decision on the merits of the Receivership Order by now.[9]

Defendants assert that the government agreed to suspend briefing on the appeal and thus cannot point to such suspension as evidence of dilatory conduct. Defendants also claim that the issues raised by the Receivership Order are completely different from those raised by the Sale Order, because the Receivership Order simply directed the receiver to explore the possibility of sale while the Sale Order "will sound the death knell for Alisal's operation of the small water systems." Defendants are correct that the Receivership Order on its face did not expressly authorize any sales; however, it was abundantly clear from the language of the order as a whole as well as the detailed findings and conclusions of the Court that immediately preceded it that the Court intended at the very least to divest Defendants of the smaller water systems.

The Court has held two public hearings and has gone through an extensive process to evaluate potential buyers for the systems. The substantial and not inexpensive efforts of the Court, the receiver, the bidders and the public itself in carrying out the requirements of the Receivership Order would be wasted if the sales were derailed at this juncture. Moreover, the buyers unquestionably are in a better position to operate the systems than the receiver.

For all of the above reasons, the Court will deny the motion for stay pending appeal.

9. On July 24, 2002, the Court of Appeals denied Defendants' request for a stay pending appeal of the Receivership Order.

## III. ORDER

(1) The government's motion to strike is GRANTED with respect to Dr. Berk's evidence and DENIED with respect to the agency reports and newspaper articles of which Defendants requested judicial notice;

(2) A civil penalty in the amount of $500,000 is imposed upon Defendants jointly and severally; the Court deems $300,000 of this penalty satisfied and therefore orders Defendants to pay a cásh penalty of $200,000;

(3) Defendants' motion for stay pending appeal is DENIED; and

(4) Counsel for the government is directed to prepare an appropriate form of final judgment reflecting both the penalty determination set forth herein and the limited extension of the receivership effected by the Court's order of April 13, 2004.