# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

ALISAL WATER CORPORATION; TORO
WATER SERVICE, INC.; NORTH
MONTEREY COUNTY WATER
SERVICE, INC.; MOSS LANDING
WATER SERVICE, INC.; NATHOLYN P.
ADCOCK; ROBERT T. ADCOCK,
            *Defendants-Appellants.*

No. 02-15907

D.C. No.
CV-97-2009-JF

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

ALISAL WATER CORPORATION; TORO
WATER SERVICE, INC.; ROBERT T.
ADCOCK; NORTH MONTEREY
COUNTY WATER SERVICE, INC.;
MOSS LANDING WATER SERVICE,
INC.; NATHOLYN P. ADCOCK,
            *Defendants-Appellants,*

and

PATRICIA ADCOCK; BRUCE PIERSON;
DAVID M. SIMCHO,
            *Defendants,*

JOHN W. RICHARDSON,
            *Receiver.*

No. 04-16210

D.C. No.
CV-97-20099-JF

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
PANEL
REHEARING AND
AMENDED
OPINION

16319

Appeal from the United States District Court
for the Northern District of California
Jeremy Fogel, District Judge, Presiding

Argued and Submitted
June 13, 2005—San Francisco, California

Opinion Filed October 13, 2005
Amended December 14, 2005

Before: Richard C. Tallman, Jay S. Bybee, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Tallman

**COUNSEL**

Marc P. Fairman, San Francisco, California, for the defendants-appellants.

Lori Jonas, Department of Justice, Washington, D.C., for the plaintiff-appellee.

---

**ORDER**

The Opinion filed on October 13, 2005, slip opinion at 14045, is amended by the opinion filed concurrently with this order. With these amendments, the panel has voted to deny the petition for panel rehearing.

The petition for panel rehearing is DENIED. No further petitions for panel rehearing or petitions for rehearing en banc will be entertained.

---

**OPINION**

TALLMAN, Circuit Judge:

Appellants Robert and Natholyn Adcock and various private water systems they owned and operated in Monterey County, California, violated various public health and safety regulations under the federal Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f - 300j. They appeal the district court's orders requiring divestiture of all except the largest water system and imposing financial penalties. We have jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(2) and affirm.

I

Prior to this litigation, the Adcock family water system

business was organized into four corporations. The largest, Alisal Water Corporation ("Alisal"), owned and operated several public water systems, some of which are named as defendants: Alco Water Service ("Alco"), Salinas Division, Blackie Road Water System # 18, Pine Canyon Division of Alco Water Service, Buena Vista Water System, Wildwood Water System, San Jerardo Water System, Vierra Canyon Water System, Vierra Estates Water System, and Langley/Valle Pacifico Water System. Alisal also wholly owned two subsidiary corporations: Moss Landing Harbor District, which operated the Moss Landing public water system, and North Monterey County Water Service, Inc. ("NORMCO"), which operated NORMCO public water system. The Adcocks held 82.5 percent ownership in Alisal. The fourth corporation was Toro Water Service ("Toro"), which owned and operated a public water system of the same name and was wholly owned by the Adcocks.[1]

The United States commenced this civil enforcement action in January 1997 on behalf of the United States Environmental Protection Agency ("EPA") against the Appellants. Numerous violations of SDWA regulations were asserted, including exceeding total coliform Maximum Contaminant Levels ("MCL"), failing to monitor for lead and copper, failing to take required monitoring samples, failing to give required agency and public notices, failing to report and falsifying monitoring reports, and failing to keep proper records. The action was initiated in response to an August 1996 written request from Dr. David Spath, Chief of the Division of Drink-

---

[1]Appellants represent that, as of 2001, these water systems collectively served approximately 28,000 people, of which Alco served the majority, approximately 25,000 people. The other systems served significantly fewer people: Blackie Road Water System (66), San Jerardo Water System (194), Vierra Canyon Water System (150), Langley/Valle Pacifico Water System (95), Buena Vista Water System (528), Moss Landing Harbor District (550), NORMCO (682), and Toro (1100). Alisal has restructured since the onset of this civil action and Wildwood Water System and the Pine Canyon Division were reorganized into the other divisions.

ing Water and Environmental Management, California Department of Health Services ("DHS"). Twelve counts of multiple regulatory violations (totaling 232 violations) and one count of fraudulent conveyance were alleged.

The district court granted summary judgment to the government on the first nine counts in August 2000. *See United States v. Alisal Water Corp.*, 114 F. Supp. 2d 927, 939 (N.D. Cal. 2000) ("*Alisal I*"). After trial, the district court again ruled for the government on the tenth count (fraudulent conveyance). In November 2002, the district court granted summary judgment against the corporate defendants, but not against Robert and Patricia Adcock individually, on the remaining three counts, eleven to thirteen. As to the regulatory violations, the Appellants challenge on appeal only the partial summary judgment on counts eleven and twelve against Moss Landing and Vierra Canyon.

The district court found that the proliferation of small water systems had stretched the Adcocks beyond their ability to manage effectively and remedy the continuing health violations, endangering their customers. To remedy the underlying violations the district court initially ordered that all of the smaller water systems, including NORMCO and Toro (collectively the "Small Utilities"), be placed in receivership and directed the receiver to investigate and make recommendations about selling the Small Utilities. *See United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1028-32 (N.D. Cal. 2002) ("*Alisal II*"). The Adcocks were permitted to remain in control of only the largest individual water system, Alco, and they were ordered to implement substantial improvements that had been recommended in a previously compiled consultant's report and to allow monitoring by the receiver. *Id.* at 1030-31. The district court denied the Appellants' motion to stay the order, and a prior panel of our court affirmed the denial of a stay. During this time, the district court held extensive formal hearings regarding the Appellants' stewardship and their course of dealings with federal and state health offi-

cials. *See id.* at 1019-22 (summarizing findings). The district court also held two public meetings (in August and December 2003), where utility customers were allowed to speak about their concerns, and the judge invited the public to send written suggestions.

In November 2003, the receiver filed his report and the district court subsequently adopted the recommended sale of the Small Utilities. The court ordered that most of the systems be sold to the highest bidders, but ordered three of the systems to be sold to a non-profit public entity, the Pajaro/Sunny Mesa Community Services District ("PSMCSD"). *See United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1032, 1038-39 (N.D. Cal. 2004) ("*Alisal III*"). PSMCSD did not have the highest bid, but the district court found that sale to PSMCSD would best serve the public interest. *Id.* at 1037 n.6. The district court denied the Appellants' motion to stay the sale order, and we affirmed the denial of a stay.

The district court also imposed monetary penalties against the Appellants. For purposes of determining the appropriate penalty amount, the district court appointed accountant Richard Pierotti to assess the liquidation value of all of the water utilities and the Adcocks' personal assets. The Appellants hired Dr. Joel Berk to review Pierotti's valuation methodology; Dr. Berk concluded that Alco was of substantially less value than Pierotti had found. The district court struck Dr. Berk's report as cumulative to evidence previously introduced by the Appellants. *Id.* at 1037-38. The district court imposed a penalty of $500,000, but then credited the Appellants $300,000 as an offset for the shortfall from not accepting all of the high bids on the sale of the Small Utilities, leaving a $200,000 total penalty due. *Id.* at 1038-39. The Appellants challenge the order appointing a receiver (No. 02-15907) and the order authorizing sale of the utilities and imposing penalties (No. 04-16210).

II

The Appellants also challenge the district court's jurisdiction over this entire eight-year litigation. They assert for the first time on appeal that the district court lacked subject matter jurisdiction because the controlling statute states that a federal EPA enforcement action must be requested by "the chief executive officer of the State" or "agency of [the] State which has jurisdiction over compliance by public water systems." 42 U.S.C. § 300g-3(b)(2). They challenge as legally insufficient Dr. Spath's request letter to demonstrate that the proper state agency requested EPA enforcement because: (1) Dr. Spath is not the head of the DHS, which they assert is the agency with primary jurisdiction over public water systems; and (2) there is nothing in the record establishing that DHS delegated such authority to him. *See* Cal. Health & Safety Code § 116325 (granting DHS the authority to enforce state drinking water regulations).

"The existence of subject matter jurisdiction is a question of law reviewed de novo." *Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831, 833 (9th Cir. 2004). "[District courts] are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2616 (June 23, 2005) (internal quotation marks and citation omitted). As a general matter, federal courts have subject matter jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States." *See* 28 U.S.C. § 1331. By this principle, suits seeking compliance with, or remedies for, violations of federal water quality statutes and regulations present federal questions. *Cf. Chasse v. Chasen*, 595 F.2d 59, 61 (1st Cir. 1979) (citation omitted) ("It is beyond dispute that validly issued administrative regulations . . . may be treated as 'laws of the United States' under § 1331(a).").

This general grant of federal question jurisdiction is not limitless—Congress may negate district court jurisdiction

"[b]y virtue of . . . a specific reference or assignment." *Erie-Net, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 519 (3d Cir. 1998); *see, e.g.*, *Staacke v. United States Sec'y of Labor*, 841 F.2d 278, 280 (9th Cir. 1988) ("[F]ederal question jurisdiction [is] subject . . . to preclusion-of-review statutes created or retained by Congress.") (internal quotation marks and citation omitted); *La Voz Radio de la Communidad v. FCC*, 223 F.3d 313, 319 (6th Cir. 2000). However, absent statutory direction to the contrary, a district court validly exercises its jurisdiction over actions "arising under" federal laws.

In addition to general federal question jurisdiction, "district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress," except as otherwise provided by Congress. 28 U.S.C. § 1345. Any exception to the general rule of § 1345 must be clear. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 808-09 (1976) ("When there are statutes clearly defining the jurisdiction of the courts the force and effect of such provisions should not be disturbed by a mere implication flowing from subsequent legislation.") (quoting *Rosecrans v. United States*, 165 U.S. 257, 262 (1897)).

**[1]** Therefore, under either 28 U.S.C. § 1331 or § 1345, the inquiry here rests on whether the SDWA contains any special limits or exceptions to the district court's general statutory subject matter jurisdiction. Various provisions reflect congressional intent to confer subject matter jurisdiction over SDWA actions to federal district courts. *See, e.g.*, 42 U.S.C. § 300g-3(b) (granting the government authority to "bring a civil action in the appropriate United States district court" to enforce compliance with agency orders); § 300j-7(a)(2) (requiring a petitioner to file a petition for review of agency action "in the circuit in which the petitioner resides or transacts business which is directly affected by the action"); § 300j-8(a) (granting district courts jurisdiction over qualified

citizen's civil actions). Indeed, "[w]henever any civil penalty sought by the [government] . . . for a violation of an applicable requirement exceeds $25,000," as in the case at bar, the government is statutorily required to bring a civil action in "the appropriate United States district court." *Id.* § 300g-3(g)(3)(C).

The SDWA statutory scheme also creates certain narrow exceptions to the district court's jurisdiction, *see, e.g.*, *id.* §§ 300g-1(b)(1)(B)(i)(III) & 300h-2(c)(7), but there is no express statutory negation of the district court's federal question jurisdiction over enforcement of the SDWA under 42 U.S.C. § 300g-3(b), the provision at issue here. Congress's express identification of particular aspects of SDWA litigation and agency action that are not subject to judicial review demonstrates that Congress was well aware of its power to limit the scope of the district court's subject matter jurisdiction over certain SDWA claims.

**[2]** The Appellants argue that 42 U.S.C. § 300g-3(b)(2) divests the district court of jurisdiction, but we disagree. Rather than creating a special exception to the district court's jurisdictional authority to hear this suit, the statute reflects only the limitations on the government's authority to bring this suit. The statute states that the federal government "may bring a civil action" in district court "if" so requested (or if authorized under conditions not relevant here), 42 U.S.C. § 300g 3(b)(2); it says nothing to limit the district court's jurisdiction over such an action if the government was not acting pursuant to an authorized request from the state.[2] We will not assume that Congress intended to deprive the court of sub-

---

[2]The Appellants contend that Dr. Spath's request letter was insufficient to grant enforcement power to the federal government. However, the district court properly concluded that the letter was a specific request by the appropriate state agency sufficient for the EPA to bring an action. The Appellant's contention that the letter was insufficient for subject matter jurisdiction under § 300g-3(b) is without merit.

ject matter jurisdiction over enforcement of federal laws where Congress has refrained from doing so and where there is no evidence of such intent. Because the SDWA includes no special provision limiting jurisdiction over federal question claims or suits brought by the United States, we conclude that the district court had subject matter jurisdiction over this suit and that federal jurisdiction to permit EPA enforcement under the SDWA statutory scheme is concurrent with that of state regulators.

## III

On appeal, the Appellants concede that they committed the majority of the SDWA regulatory violations found by the district court and challenge the adverse summary judgment only on counts eleven and twelve against Moss Landing and Vierra Canyon. The government demonstrated that Moss Landing and Vierra Canyon committed eight violations of total coliform MCL regulations in 2000 and 2001. The Appellants argue that judgment was impermissibly based on "special" samples taken by the Appellants to investigate anomalous results provided by the state. The district court found that the samples were "routine" and that the only thing that made these samples "special" was that the Appellants labeled them as such.

[3] "We review the grant of summary judgment de novo." *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). The question we must answer is whether the government demonstrated through appropriate means that these water systems violated total coliform MCLs. By regulation, a water system which collects fewer than 40 samples per month in accordance with its routine monitoring program is in compliance with total coliform MCL if no more than five percent of samples in a given month are total coliform-positive. 40 C.F.R. § 141.63(a)(1). A total coliform MCL violation is based on "routine" and "repeat" samples, *id.* § 141.21(a)(5)-(6),

(b)(7), and may not be based on samples that have been invalidated, § 141.21(c), or on "[s]pecial purpose samples," § 141.21(a)(6).

**[4]** The regulation details the requirements for a "routine monitoring plan," which requires collection of "total coliform samples at sites which are representative of water throughout the distribution system according to a written sample siting plan." *Id.* § 141.21(a). But the regulation does not expressly define "routine samples" for purposes of establishing a violation. The Appellants interpret 40 C.F.R. § 141.21 as requiring that only samples taken as part of a routine monitoring plan be considered "routine." The government acknowledges that only "routine" and "repeat" samples may be relied upon, and that the samples at issue here were not "repeat" samples or taken as part of a routine monitoring plan. However, the government asserts, and the district court concluded, that "routine" samples are any samples which are not "special" under the regulation and are representative of water throughout the system. Therefore, the operative question is what constitutes a "routine" sample.

An agency is entitled to interpret its own regulation and "ordinarily its construction will be affirmed if it is not clearly erroneous or inconsistent with the regulation." *Pac. Coast Med. Enters. v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980) (citations omitted). However, because neither party introduced evidence of an official agency definition of a "routine" sample for purposes of establishing a violation under the regulation, we do not necessarily defer to the government's position. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (noting that deference does not extend to "agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice"). Such deference may still be appropriate, however, when there is "no reason to suspect" that an agency interpretation introduced only through a legal brief "does not reflect the agency's fair and

considered judgment on the matter." *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

**[5]** We need not decide precisely how much deference the EPA is due here because we conclude that the only reasonable interpretation of 40 C.F.R. § 141.21(a) is the one espoused by the government; we therefore agree that any sample that is representative of water throughout the system and not a "special purpose sample" or otherwise invalidated is "routine" and may suffice to establish a regulatory violation. The Appellants' interpretation of the regulation is untenable. Precluding reliance on accurate water quality samples simply because they were not taken according to a preset plan would prevent the government from identifying and remedying total coliform MCL violations in a variety of contexts, such as where the water utility itself submitted only negative samples under its routine monitoring schedule. This effectively could insulate a violator from judgment in cases where the water utility purposefully conceals excessive coliform test results in its routine monitoring plan reporting or fails to keep accurate records of testing, as the Appellants did here. *See Alisal I*, 114 F. Supp. 2d at 934. Interpreting the regulation to allow reliance on only samples submitted under a routine monitoring plan would clearly undermine the effectiveness of the reporting requirements and threaten public health and safety, and so we reject this unreasonable interpretation of the statute. *Cf. SEC v. Edwards*, 540 U.S. 389, 395 (2004) (addressing securities law and declaring that the "[Supreme] Court will not read into the . . . laws a limitation not compelled by the language that would so undermine the laws' purposes.").

Moreover, our interpretation is consistent with the overall regulatory scheme. When interpreting a regulation, we must avoid an interpretation that would render another regulation superfluous. *See, e.g.*, *Dodd v. United States*, 125 S. Ct. 2478, 2490 (2005) (Stevens, J., dissenting). As noted, the regulation expressly requires reliance on routine and repeat samples, *see* 40 C.F.R. § 141.21(a)(5)-(6), (b)(7), and expressly precludes

reliance on "special purpose samples," § 141.21(a)(6), and samples that have been invalidated, § 141.21(c). If an MCL violation could be established only on the basis of routine monitoring samples, then there would be no need for regulators to identify specific types of samples, unrelated to routine monitoring, that are not the proper basis for such violations. We therefore conclude that reliance on "routine" samples necessarily includes reliance on any samples that are not "special purpose samples" or otherwise invalidated.

[6] The next question is whether the samples here were "special purpose samples;" otherwise, they are properly considered "routine" and the district court could therefore rely on them.[3] *See id.* § 141.21(a)(6). "Special purpose samples" are defined by example as "those taken to determine whether disinfection practices are sufficient following pipe placement, replacement, or repair." *Id.* This definition clarifies that "special purpose" samples are those taken at a time when the system has been altered in some way, or there are unusual circumstances, such that the sample taken may not be indicative of the water quality in general unaltered use. This is also consistent with the regulatory approach to routine monitoring samples which must be taken "at sites which are representative of water throughout the distribution system." *Id.* § 141.21(a)(1).

[7] The samples on which the district court relied in counts eleven and twelve are not "special purpose samples" under this definition. There is no suggestion here that the samples were tainted by recent changes to the system, and, as the district court found, "[n]othing in the record suggests that the subject samples were less accurate or probative than other 'routine' or 'repeat' samples." There is also no suggestion here that the samples were otherwise invalid or unreliable, so it was reasonable and consistent with the regulation to rely

---

[3]Neither party suggests that these samples were invalid under the regulation or compliant with total coliform MCL requirements.

upon them. We therefore conclude that the samples in question were "routine" and we affirm summary judgment on counts eleven and twelve.

## IV

### A

The remainder of the Appellants' claims on appeal center on the district court's choice of remedy and the process by which the remedy was determined. The Appellants argue that the district court abused its discretion in ordering divestiture because the court did not closely tailor injunctive relief to address the threat of future harm or exercise the least possible power adequate to achieve the proposed end. Their argument in summary is that the district court: (1) erred in reacting to past violations and not considering the current status because the facts show a "sharp reduction in violations after 1994" in the Small Utilities; and (2) erred in not considering each utility separately, specifically referring to Toro, which has been in regulatory compliance since 1994.

[8] The Appellants assert that the district court exceeded its statutory authority in ordering divestiture of the Small Utilities. The Appellants base their claim on the argument that the court may not order such a remedy because Congress failed to list divestiture expressly as a possible remedy under the SDWA.[4] However, the court will not generally infer restrictions on inherent judicial authority from congressional

---

[4]The Appellants raise this issue for the first time on appeal and so we could consider it waived. *See Carlson*, 900 F.2d at 1349. The Appellants were well aware that the government was seeking complete divestiture and that the district court had proposed partial divestiture, *see Alisal II*, 326 F. Supp. 2d at 1027, and they fail to explain why they did not or could not challenge the district court's authority at that time. However, this is a pure question of law and the record is sufficient to review the issue on appeal. We therefore conclude that the government will not be prejudiced if we reach the issue here. *See Carlson*, 900 F.2d at 1349.

silence: "[U]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Owner Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 367 F.3d 1108, 1112 (9th Cir. 2004) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)). Where the public interest is involved, "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter*, 328 U.S. at 398 (citation omitted).

**[9]** Here, the SDWA gives the district court authority to enter "such judgment as protection of public health may require." 42 U.S.C. § 300g-3(b). There is no limiting language, so the statute incorporates the full panoply of the court's equitable powers. *Cf. United States v. Mass. Water Res. Auth.*, 48 F. Supp. 2d 65, 71-72 (D. Mass. 1999) (concluding that the SDWA enforcement provision does not "strip the courts of their equitable powers"). We therefore conclude that ordering partial divestiture was not outside of the district court's authority.[5]

"We review a district court's decision to issue a permanent injunction for abuse of discretion, but we review any determination underlying the court's decision by the standard that applies to that determination." *United States v. Hovsepian*, 359 F.3d 1144, 1156 (9th Cir. 2004) (en banc) (citing *Silver*

---

[5]In a related argument, the Appellants assert that the district court impermissibly encroached on the power of the California Public Utility Commission ("CPUC"), which has some jurisdiction over public drinking water. *See Hartwell Corp. v. Superior Court*, 38 P.3d 1098, 1108-12 (Cal. 2002) (discussing the complex overlap in authority over drinking water regulation between DHS and the CPUC). They advance no legal basis to explain how the fact that CPUC has some authority over water systems negates the district court's broad authority to enforce federal laws through exercise of its equitable powers. Moreover, as the government points out, the sales are necessarily subject to approval by the CPUC. *See Alisal II*, 326 F. Supp. 2d at 1029. The Appellants' argument is without merit.

*Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 826 (9th Cir. 2001)). The district court's choice of remedies is reviewed for an abuse of discretion. *See Stone v. City & County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992). Review of the scope of injunctive relief is also for an abuse of discretion. *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 823 (9th Cir. 2002). The Appellants do not allege that there were any clearly erroneous findings of fact,[6] so we may only reverse if we find that the district court misapplied the law or "rule[d] in an irrational manner." *Chang v. United States*, 327 F.3d 911, 925 (9th Cir. 2003) (quoting *United States v. Sherburne*, 249 F.3d 1121, 1125-26 (9th Cir. 2001)).

In arguing that the district court was reacting only to past conduct and not considering recent improvements, the Appellants mischaracterize the record. The district court expressly considered the Appellants' overall improvements in compliance subsequent to initiation of this enforcement suit, but found (and it is not challenged) that Appellants *continued* to violate reporting requirements, and produce "inaccurate test results and unreasonable delay in addressing incidences of contamination . . . through and including the time of trial." *Alisal II*, 326 F. Supp. 2d at 1018; *see id*. at 1026. There are extensive factual findings demonstrating Appellants' continued noncompliance, which did not cease after initiation of this litigation. *Id.* at 1018-21. Moreover, the district court found and recounted the Appellants' continued unwillingness to work with the government, which suggests that ongoing compliance would continue to be problematic. *See Alisal III*, 326

---

[6]The Appellants do assert in a footnote of their brief to this Court that their son, Thomas Adcock, was qualified to manage the water systems. This could be construed as challenging the district court's finding that the Appellants lacked sufficient managerial competence to comply with the SDWA. *See Alisal II*, 326 F. Supp. 2d at 1014, 1023-25. However, the issue is not squarely presented, and regardless is without merit. The district court specifically outlined Thomas Adcock's shortcomings with respect to managing the family business. *See id*. at 1023-25. We conclude that these findings are not clearly erroneous.

F. Supp. 2d at 1036-37; *Alisal II*, 326 F. Supp. 2d at 1022-23. Given the Appellants' unwillingness or inability to comply in an accurate and timely manner while under the close supervision of the EPA and the district court, it was rational to conclude that the Appellants' behavior would not improve once this litigation ends.

Similarly, Appellants' argument that Toro should not have been sold because it has been compliant since 1994 is not persuasive. The district court based its partial divestiture order on the rationale that Appellants could not meet their regulatory obligations given the number of water systems they controlled and the pervasive scope of the problems involved with the various systems. *See Alisal II*, 326 F. Supp. 2d at 1024, 1026 (noting that evidence showed lack of "managerial resources and expertise to manage effectively the numerous water systems . . . , especially the smaller ones"). The district court's decision reflects its well-supported belief that the Appellants' efforts were spread too thinly, both financially and administratively, across the various systems and that they were not capable of handling more than one system in a manner compliant with all regulatory requirements. *See id.* at 1028. This is not an irrational conclusion given the Appellants' poor overall performance history, and is a valid concern in fashioning an appropriate remedy.

"In issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest." *Idaho Watersheds Project*, 307 F.3d at 833 (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). Clearly, the Adcocks have an understandable personal interest in maintaining their family business and a property interest in their ownership of the various systems. On the other hand, there is no question that the public interest at stake here, the quality of public drinking water and the health and safety of the consumers, is fundamental.

The record reflects that the district court adopted a reasonable compromise in fashioning appropriate relief and tailored

a remedy that took into consideration both the substantial public interest and the Adcocks' personal interest. The government originally asked for a complete divestiture; the Appellants asked only to have to implement recommended system upgrades (which the record shows they could not afford to finance). The district court did not order sale of the largest water system, Alco. There, the district court only ordered implementation of the recommended improvements.

The district court's remedy allows the Appellants to control operations and service for approximately 90 percent of their original customer base in a very streamlined fashion, thereby "giving [Appellants] a clear opportunity to demonstrate that they can operate at least one water system in compliance with the law." *Alisal II*, 326 F. Supp. 2d at 1028. The Appellants themselves admit that most of the compliance problems occurred in the Small Utilities (other than Toro). The Appellants have proven through their service history and throughout this litigation that they were unable to manage effectively the several water systems in order to serve the public health. Simply put, they now have the opportunity to prove that they can safely manage just one.

The Appellants argue that letting them continue to own and operate Alco shows that the court was acting inconsistently, but we think that it demonstrates that the district court was balancing the competing interests of the public and the Appellants, despite the egregious nature of their prior course of conduct. *Alisal II*, 326 F. Supp. 2d at 1028-29 (concluding that while full divestiture was fully justified, partial divestiture was a "less drastic remedy" and required under principles of equity). While other appropriate remedies are conceivable, our review is limited to whether the district court erroneously applied the law or acted irrationally in imposing the remedy it did.

[10] We conclude that the Appellants' personal interests in maintaining ownership over the Small Utilities is substantially

outweighed by the profound public interest at stake here. The regulatory violations that the Appellants committed were numerous and significant. They were entrusted with safeguarding the health and welfare of the thousands of individuals who rely on these water systems, and they have not effectively responded to the water quality problems. Furthermore, the record supports the district court's conclusions that the Appellants have acted in a manner inconsistent with an appreciation for the importance of their obligation to the public. We conclude the district court fashioned a rational remedy that fairly took into consideration the competing interests. There was no abuse of discretion in the means employed.

B

The Appellants assert next that the district court violated their due process rights by: (1) conducting the receivership bidding process in secret; and (2) improperly considering and giving weight to public comments and letters not part of the record, not taken under oath, and not subject to cross-examination. However, the Appellants waived their due process claim regarding the receivership bidding process by failing to raise it in the district court. They state that they "repeatedly complained" that they were not being informed about the bidding and sales process. However, their only support in the record is that they once told the district judge that they did not know the status of the sales and requested additional information, and the court immediately ordered that the receiver make sales-related documents available as part of his duties.

This single evidentiary proffer is hardly evidence of repeated complaints. It does not demonstrate that the receiver willfully withheld information (or even that the Appellants had ever requested the information before or after that day). Additionally, it does not rise to the stature of a "due process" violation. Thus, the Appellants do not demonstrate through the record how their participation was unjustly limited, and

we therefore will not consider the claim. *See, e.g.*, *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) ("We will not take up an issue not properly raised below unless necessary to prevent manifest injustice.") (citation omitted).

As to the public hearings, the Appellants argue that they were not allowed to "question" the process, but they did not object to the process as it occurred. On appeal, the Appellants admit they did not object to the district court's *holding* the public hearings, so this issue is waived. Nor did the Appellants object to the lack of evidentiary formality in conducting the hearings. No objections were timely raised that the speakers were not sworn and were not subject to cross-examination. However, they did object to the district court's *considering* the statements and letters gathered through the hearing process in the divestiture proceedings, so this aspect of the claim is properly before us.

**[11]** As the Supreme Court acknowledges, "due process" is difficult to define. *See Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24-25 (1981). The process that is due varies according to the nature of the right and the type of proceedings. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.") (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)) (alteration in original). At its core, due process requires that a party have adequate notice and opportunity to be heard. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). In considering whether a district court accorded adequate due process, appellate courts "must look at the actual substance, not the name or form, of the procedure to see if the claimants' interests were adequately safeguarded." *SEC v. Elliott*, 953 F.2d 1560, 1567 (11th Cir. 1992) (discussing summary receivership proceedings and citing *SEC v. Wencke*, 783 F.2d 829, 836 (9th Cir. 1986)).

We conclude that there was no due process violation in the district court considering the information obtained through the public hearings. Importantly, there is no suggestion that the Appellants were denied the basic elements of due process—adequate notice and opportunity to be heard. This is not a situation where a party was unaware of an adverse proceeding or the district court denied a party forms of process to which they had expressly asserted a right. The Appellants were well aware of the contemplated hearing process and their counsel attended the hearings. There is no showing that they were in any way limited in their ability to participate in the hearings or to refute any testimony presented, or that their interests were prejudiced or marginalized in this process. Accordingly, we do not see how the Appellants' due process rights were denied. *See Guenther v. Comm'r*, 939 F.2d 758, 760 (9th Cir. 1991) (explaining that a party's due process rights would be infringed if they were "unfairly prejudiced" by ex parte communication).

Although the form of this process was not typical for the courts, and we do not endorse such a practice in routine civil enforcement actions, the substance of the evidence adduced at the hearings is similar to that which could have been introduced by the government through affidavits or testimony. *See, e.g.*, *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 576 (7th Cir. 1989) (holding that, where defendants were found to have committed deceptive trade practices in a nationwide telemarketing operation, the trial court did not abuse its discretion in admitting affidavits from consumers who had purchased travel vouchers from the defendants). In a case of this magnitude, directly affecting public health, evidence of the views of the individuals affected by the outcome was relevant to the district court's choice of remedy. The Appellants have pointed to no legal authority that would bar the district court from proceeding in a public-hearing forum and they did not timely object to proceeding in such a fashion. We recognize that "a district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the

administration of the receivership is extremely broad," *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986), and the hearing process was an efficient and direct way for the district court to consider the views of the interested public, which had a manifest and significant stake in the proceedings.

Nor do the Appellants point to authority that would require the district court to conduct a remedy-phase hearing in the same manner or under the same evidentiary standards that it conducts a trial. In the context of a civil suit "cross-examination is not, in every instance, a sine qua non of due process. It all depends on the situation." *David v. City of Los Angeles*, 307 F.3d 1143, 1147 (9th Cir. 2002), *rev'd on other grounds*, 538 U.S. 715 (2003); *see U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1287 n.13 (11th Cir. 2001) (noting that "[o]f course, the Confrontation Clause is not applicable to civil cases"). In *Federal Trade Commission v. Figgie International, Inc.*, 994 F.2d 595 (9th Cir. 1993), for example, we allowed the district court to base its calculation of the maximum amount of redress for which the defendant might be liable on the agency's summation of 127 letters of complaint that it had received from private citizens. *Id.* at 608-09 (determining that admission of the letters fell into the residual hearsay exception).[7] Similarly, the district court here considered evidence of unsworn public comment not to demonstrate the violations that the Appellants committed, but for the limited purpose of fashioning a remedy for the violations.

In concluding that there was no due process violation in this case, we also rely substantially on the fact that the Appellants' primary complaints against the evidence adduced at the

---

[7]The *Figgie International* court relied on its analysis of whether the complaint letters were admissible under the Federal Rules of Evidence. *See* 994 F.2d at 608-09. The Appellants have not raised such an argument here on appeal, although their "due process" claim could properly be characterized as an unpreserved challenge to the district court's admission of such evidence. Because the Appellants did not raise an evidentiary objection to the district court or on appeal, we consider it waived.

public hearings—the lack of sworn testimony and cross-examination—are the direct result of their own failure to object to the district court holding such hearings and their failure to timely object to the manner in which the hearings were held and in which the evidence was introduced. They assert that they were "never allowed" to address the public letters and comments, but they fail to point out where in the record they ever asked to do so, despite the fact that counsel was present at the hearings. Had the Appellants timely objected to the proceedings or requested that the hearings be conducted in a more formal way, the district court could have modified the process and cured any potential defect. *See United States v. Odom*, 736 F.2d 104, 114 (4th Cir. 1984) (noting that "[i]t is well settled" that a party waives a challenge to failure to swear in a witness by failing to raise the point during the witness's testimony, when it could have been corrected).

**[12]** We hold that the Appellants' due process rights were not violated by the district court's fashioning a remedy for regulatory violations by relying in part on evidence introduced through public hearings where: (1) the Appellants failed to object to the district court's conducting such hearings; (2) the Appellants failed to object to the witnesses' not being sworn or subject to cross-examination; and (3) the Appellants failed on appeal to show how they were prejudiced by admission of the evidence.[8]

V

The Appellants argue next that the court-ordered sale of the Small Utilities was confiscatory because the sale prices realized were not indicative of their true value, and they seek just compensation under the Fifth Amendment's takings clause. The government points out that the takings clause issue was

---

[8]We emphasize that our holding is extremely narrow. Had the Appellants made timely objections to this unusual procedure or demonstrated prejudice, our analysis might be different.

not raised below and should therefore be waived. In response, the Appellants contend that they raised a takings claim below in their comments to the Pierotti report. They cite to two places in the record. First, in the context of disputing the method of valuation, they argued before the district court only that "[w]here [they are] forced to sell the utility for less than its rate base, as the [r]eceiver recommends here, there is a taking that violates the Constitution." And second, they prefaced a feasibility argument with: "in light of the constitutional issues about confiscation . . . ." These are the only references to a takings claim in the record covering years of litigation.

These references were brief, conclusory statements made with no supporting legal argument and so are insufficient to preserve a takings claim for appeal. *See, e.g.*, *Broad v. Sealaska Corp.*, 85 F.3d 422, 430 (9th Cir. 1996) ("To have been properly raised below, the argument must be raised sufficiently for the trial court to rule on it.") (internal quotation marks and citation omitted); *Banks v. Rockwell Int'l N. Am. Aircraft Operations*, 855 F.2d 324, 326 (6th Cir. 1988) (holding that a "vague reference" to an issue before the district court was insufficient to preserve that issue on appeal). We therefore consider the Appellants' takings claim waived.

VI

The Appellants challenge the overall monetary penalty imposed on the basis that the district court did not consider the report of Dr. Berk that they submitted. The report challenged the valuation findings of the court-appointed accountant, Pierotti. The Appellants contend that Alco was substantially overvalued and that the resulting penalty was excessive. The substance of their argument is that the district court initially suggested that they would be allowed to object to the Pierotti report at the penalty hearing, but then had a "change of heart" and refused to consider the information.

The district court's decision to exclude expert testimony is reviewed for an abuse of discretion. *Kumho Tire Co. v. Car-*

*michael*, 526 U.S. 137, 152 (1999). Prior to seeking to introduce Dr. Berk's report, the Appellants had already introduced an expert witness, Carl Danner, who testified as to valuation of the water systems. After reviewing the evidentiary proffer of Dr. Berk's report, the district court noted that when it said it would consider further evidence, it had expected evidence about "any changes in circumstances that might affect Mr. Pierotti's analysis." The court concluded that Dr. Berk's report was instead simply cumulative of the Danner testimony and "[v]iewed as a whole, Dr. Berk's opinions concern[ed] facts known to and litigated by the parties at trial." *Alisal III*, 326 F. Supp. 2d at 1037.

[13] The Appellants fail to show how Dr. Berk's report was new or different from the evidence they had introduced at trial, and thus they fail to show how the district court abused its discretion in dismissing the report as cumulative. We affirm the exclusion of the proffered evidence. The Appellants raise no other argument as to why the penalty was excessive and so we also affirm the penalty as imposed.[9]

---

[9]The penalty imposed was well below the maximum penalty allowed by statute, which states, in part, that:

> [I]f the court determines that there has been a violation of the regulation or schedule or other requirement with respect to which the action was brought, the court may, taking into account the seriousness of the violation, the population at risk, and other appropriate factors, impose on the violator a civil penalty of not to exceed $25,000 for each day in which such violation occurs.

42 U.S.C. § 300g-3(b); *id*. at § 300g-3(g)(3)(A). The Appellants committed 232 violations, many of which could be considered as extending over multiple days, which the district court concluded would result in a maximum civil penalty range from $17 million to $400 million. *Alisal III*, 326 F. Supp. 2d at 1035. The government argued that a penalty of $3 million to $5 million dollars was appropriate. As noted, the district court ultimately imposed a penalty of $500,000 with a $300,000 offset for the receiver's acceptance of bids that were not the highest bids on three water systems. *Id.* at 1038-39.

## VII

In its receivership order, the district court enjoined not only the named defendant individuals, Robert and Natholyn, but also their children, Thomas and Lynette, from "acquir[ing] any new interest, financial or otherwise, in any 'public water system' . . . without the express permission of [the] Court." *Alisal II*, 326 F. Supp. 2d at 1032. The Appellants do not claim that the substantive injunctive limitation is overly broad or otherwise challenge the scope of the injunction but argue that the injunction is simply not valid against Thomas and Lynette because they were not parties named in the lawsuit. The Appellants specifically seek a ruling that would invalidate the injunction under Federal Rule of Civil Procedure 65(d). However, we cannot reach this issue.

Although not specifically mentioned in Appellants' briefs,[10] Federal Rule of Appellate Procedure 3(c) requires the notice of appeal to:

> [S]pecify the party or parties taking the appeal by naming each one in the caption or body of the notice, but an attorney representing more than one party may describe those parties with such terms as "all plaintiffs," "the defendants," "the plaintiffs A, B, et al.," or "all defendants except X" . . . .

FED. R. APP. P. 3(c)(1)(A) (emphasis added). Non-parties to the original action *may* appeal where they are "bound by the order from which they were seeking to appeal." *Devlin v. Scardelletti*, 536 U.S. 1, 8 (2002). But non-parties must also pass through the ordinary "jurisdictional threshold" of Rule 3(c), which requires that they be named in the notice of appeal. *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 315 (1988). Moreover, the Appellants are bound by the ordinary

---

[10]"Jurisdictional issues must be raised by this court *sua sponte*." *MacKay v. Pfeil*, 827 F.2d 540, 542 (9th Cir. 1987).

time-constraints imposed upon parties and non-parties alike by Federal Rule of Appellate Procedure 4(a)(1), which requires that a notice of appeal be filed within 30 days after judgment. *See* FED. R. APP. P. 4(a)(1).

**[14]** Here, Thomas and Lynette were not named as defendants in the notice of appeal. The notice of appeal named the following defendants: Alisal Water Corporation; Toro Water Service, Inc.; North Monterey County Water Service, Inc.; Moss Landing Water Service, Inc.; Robert T. Adcock; and Natholyn P. Adcock. Because Thomas and Lynette were not included in the first notice of appeal, they were required to file a separate appeal within 30 days of judgment. They failed to do so. Moreover, it is not objectively clear from the notice of appeal that they intended to appeal. *Cf. Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., LLC*, 339 F.3d 1146, 1149 (9th Cir. 2003) (holding that when a party's intent to appeal is objectively clear, that party is not prevented from going forward under Federal Rule of Appellate Procedure 3(c)); *Simo v. Union of Needletrades, Indus. & Textile Employees*, 322 F.3d 602, 610 (9th Cir. 2003) (same). Consequently, we do not have jurisdiction to consider their challenge to the injunction.

## VIII

We conclude that the district court had subject matter jurisdiction over this SDWA civil enforcement action and did not abuse its discretion or violate the Appellants' due process rights in fashioning the remedy imposed.

AFFIRMED.